378 So.2d 663 (1980)
Dan HINDMAN
v.
STATE of Mississippi.
No. 51194.
Supreme Court of Mississippi.
January 9, 1980.
Fox & Gowan, Marc A. Biggers, Jackson, for appellant.
A.F. Summer, Atty. Gen. by Billy L. Gore, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before SMITH, P.J., and WALKER and BROOM, JJ.
*664 SMITH, Presiding Justice, for the Court:
Dan Hindman was convicted in the Circuit Court of the First Judicial District of Hinds County under an indictment charging him with obtaining valuable services by false pretenses under the "bad" check statute, Mississippi Code Annotated section 97-19-55 (1972). He was sentenced to three years imprisonment with two years suspended and fined $1,000. He has appealed, assigning several alleged errors for reversal.
A Mrs. Denson agreed to emcee a bridal show for Hindman at the Jackson Hilton Hotel for a fee of $300.00. The show was held and Mrs. Denson duly acted as mistress of ceremonies. After the show was over and Mrs. Denson's services had been fully performed, Hindman gave her a check for the $300.00 fee agreed upon. Payment of this check was declined by the bank upon which it was drawn because Hindman did not have sufficient funds on deposit with which to pay it.
Repeated efforts were made by Mrs. Denson and her attorney to collect the $300.00 and even after Hindman had been indicted and the setting of the present case had been made, Mrs. Denson's attorney stated:
We were  we were willing to accept the money, I believe, it would be a true statement that Mrs. Denson would have accepted the money and dismissed this entire thing as of 9:00 o'clock this morning.
Leaving aside the fact that it appears Hindman's prosecution was one of the means by which collection was sought to be enforced, the prosecution was founded upon Mississippi Code Annotated section 97-19-57 (1972) which amends Mississippi Code Annotated section 2153 (1942).
Pollard v. State, 244 So.2d 729 (Miss. 1971) was decided under the former statute, but the principles announced in it are valid and relevant here. In Pollard, this Court said:
The one indispensable element of this offense is the receiving of value for the check at the very time it is delivered. In other words, the seller parts with something of value on the belief that the check is good at that particular time. Kitchens v. Barlow, 250 Miss. 121, 164 So.2d 745 (1964); Broadus v. State, 205 Miss. 147, 38 So.2d 692 (1949); Granada Coca Cola Co. v. Davis, 168 Miss. 826, 151 So. 743 (1934).

*665 The gravamen of the offense was succinctly stated in Jackson v. State, 251 Miss. 529, 170 So.2d 438 (1965):
"So an essential element of the offense under section 2153 is the making and delivering of the check to another person for value, and thereby obtaining from such other person money, goods, or other property of value." (Emphasis added). 251 Miss. at 531, 170 So.2d at 439.
It would appear that the transaction between Pollard and B & M Motors was a credit sale, and not an exchange for value based on the belief that Pollard's check was good at that particular moment. (244 So.2d at 730).
And further:
This Court said in Grenada Coca Cola Co., et al. v. Davis, 168 Miss. 826, 151 So. 743 (1934):
"The so-called bad check law does not cover the obtaining of goods where the goods had already been delivered, had passed completely out of the possession of the seller and away from his hands and premises in a previously completed transaction or transactions, although those transactions may have been at previous hours on the same day. There must be an exchange for the check at the time of delivery. The bad check law is severe enough without extending it by construction so as to include past deliveries, to say nothing of the question of the constitutional validity of such a statute if it were so construed." (Emphasis added).... (244 So.2d at 731).
In enacting Mississippi Code Annotated sections 97-19-55 and 97-19-57 (1972), it must be assumed that the Legislature was aware of the decision in Pollard as well as of section 30 of the Mississippi Constitution prohibiting imprisonment for debt, and carefully drafted the statute so as not to render it unconstitutional by transgressing this constitutional provision.
The present statute, section 97-19-55, Mississippi Code Annotated (1972), is in the following language:
It shall be unlawful for any person with fraudulent intent to make, draw, issue, utter or deliver any check, draft or order for the payment of money drawn on any bank, corporation, firm or person for the purpose of obtaining money, or any article of value, or to obtain services except payment or payments on past due accounts, knowing at the time of making, drawing, issuing, uttering or delivering said check, draft or order that the maker or drawer, has not sufficient funds in, or on deposit with, such bank, corporation, firm or person, for the payment of such check, draft, or order in full, and all other checks, drafts or orders upon such funds then outstanding. (Emphasis added).
It is to be noted that, in order to commit the offense proscribed, the "bad" check must have been given for the "purpose of obtaining money, or any article of value, or to obtain services except payment or payments on past due accounts."
In other words, reliance upon the check must have been the efficient inducement which moved the party receiving it to part with something of value, including valuable services, relying upon its validity.
Here, the bridal show had been concluded and it is admitted that Mrs. Denson had already completed her services before the check was written or delivered. The check was not the inducement by means of which Mrs. Denson's services were obtained. The services were performed and completed before the check ever came into existence. The check, therefore, was given in payment of the debt which Hindman had incurred and the transaction does not come within the definition of the crime proscribed in Mississippi Code Annotated section 97-19-55 (1972). Moreover, it should be noted that the law does not look with favor upon the use of the criminal laws as a means of coercing payment of a debt.
In view of the conclusion we have reached it becomes unnecessary to consider the other errors assigned for reversal.
REVERSED AND APPELLANT DISCHARGED.
*666 PATTERSON, C.J., ROBERTSON, P.J., and WALKER, BROOM, LEE and COFER, JJ., concur.
SUGG and BOWLING, JJ., dissent.
BOWLING, Justice, dissenting:
I respectfully dissent. In my humble opinion, a primary purpose for opinions being issued by this Court interpreting the law is to settle legal issues so that the people will know the answers to the problems for future reference and action. The majority opinion in this case results in confusion and doubt as to what in reality is the "bad check law" situation. It will be remembered that some few years past, the Court struck down the then existing "bad check" statute as being unconstitutional. The Legislature then, in 1972, passed the present act involved in this case. The purpose of that act was to remedy the unacceptable features of the previous law, and more particularly, to clarify the bad check law in regard to "services" received for which a "bad check" is given.
I hasten to say that the present statute does not contemplate criminal prosecution for persons who mistakenly and unintentionally give a check when the account is merely overdrawn. The statute specifically requires proof beyond a reasonable doubt that the check for services was given with fraudulent intent.
The majority opinion justifies its position under the case of Pollard v. State, 244 So.2d 729 (Miss. 1971). As previously stated, the Legislature, in 1972, sought to cure the errors in the old bad check law which were brought to light in Pollard. In that case, the Court only discussed the bad check given obtaining "goods or other property of value." According to the opinion in the present case, the Court is now directing its attention to the provisions of the 1972 act regarding the giving of a bad check for "services." The gist of the opinion, and what makes it so confusing, is that it makes the blanket holding that no "bad check" with "fraudulent intent" can be given for services unless the check was given and accepted prior to the rendering of the services. In my opinion, this is where the confusion is created.
Anyone can sit down and list hundreds of "services" done by persons or firms for remuneration. Some might take a very short time and some might take a long time. The majority opinion mandates that the giving of a bad check with the fraudulent intent of not paying for the services does not come within the statute unless the check was given prior to the service being rendered. In effect, the majority opinion states that this part of the new bad check law is unconstitutional without so holding. The Legislature, in my opinion, clearly informed the public of its intention when it added after "services" the following: "except payment or payments on past due accounts." This clearly indicates legislative intent that in certain instances the fraudulent payment for services could be either simultaneous with or immediately after the service was rendered. As hereinbefore stated, if this is not the proper interpretation, the statute should be declared void and we should say that no check could be given fraudulently for anything other than "goods and merchandise."
We could list a lot of unreasonable situations that result from the majority opinion. For instance, suppose a person owns a combination convenience store and service station. If a person intends to "fraudulently" give a bad check for a loaf of bread in the convenience store, he has committed a crime. On the other hand, if the same person drives up to the service station part of the business with a flat tire the convenience store operator has to first request whether or not payment will be made by check, and, if so, demand the check prior to repairing the tire and using his materials to do so rather than receiving it immediately thereafter.
Another unreasonable situation that would result is a hypothetical case where a homeowner suddenly has a break in a water pipe that in a short time will ruin a large part of his house. He calls a plumber who can stop the condition by merely turning a wrench, but under the majority holding, he *667 is mandated to tell the homeowner, "Now, I can't turn this wrench until you give me a check if you intend doing so." Many similar hypothetical situations would result for the reason, as hereinbefore stated, that all persons, firms or corporations who perform "services" of any type cannot do so, if there is any doubt of payment, without first saying "give me your check." I do not think the Legislature intended to place this burden on the people rendering services for a livelihood.
As stated at the outset, and as I have attempted to explain, the majority opinion confuses the law rather than clarifying it.
SUGG, J., joins in this dissent.